United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SUZANNE STONE,

        Plaintiff,

    v.

UNITEDHEALTHCARE INSURANCE
COMPANY, et al.,

        Defendants.

Case No.  17-cv-04832-RS

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

## I.  INTRODUCTION

Plaintiff Suzanne Stone has a health care service plan (also known as a health maintenance organization, or HMO) provided as a benefit of her employment. The plan is funded by defendant UnitedHealthcare Insurance Company ("UHIC") and administered by U.S. Behavioral Health Plan, California, which does business as "Optum."  In 2014, Stone's daughter, G.S., suffered from severe anorexia nervosa and co-occurring psychiatric disorders, for which she first received care in an intensive day-treatment program at the University of California San Diego (UCSD).  It was eventually determined that G.S. needed treatment at a residential facility. She was admitted to the Eating Recovery Center (ERC), in Denver Colorado, where she received treatment for just over two months, first in a residential treatment setting, and for the last approximately two weeks, in a lower level of treatment known as a "partial hospitalization program."

Optum refused to pay for G.S.'s treatment at ERC, contending Stone's benefit plan does not cover services outside the state of California, except under circumstances not relevant here.

Stone brought this action under the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U.S.C. § 1001 *et seq.* to recover benefits, interest, costs, and attorney fees.  The parties have presented cross-motions for summary judgment.[1] Because the undisputed material facts do not show Optum had an obligation to pay for G.S.'s out-of-state treatment, its motion will be granted, and Stone's cross-motion will be denied.

## II.  BACKGROUND

In June of 2014, G.S. began treatment in an eating disorder day program at UCSD that provided her with mental health services five and one-half days per week.[2] While in the program, G.S. required emergency room visits on occasion, including one instance where she was admitted to the hospital and fed through a naso-gastric tube. Beginning in July, G.S.'s treatment providers and her parents began considering sending her to a residential program, contingent on whether she continued to have set backs in treatment.

On July 7th, Stone called Optum to ask about coverage for out-of-state eating disorder facilities. Optum told Stone that her plan did not cover out-of-state treatment other than emergency inpatient. Stone then said that a facility in Colorado offered "the Maudsley program," and asserted that treatment model was not available at any California facility. Optum advised Stone to investigate further to determine if the Maudsley program was offered in-state. Stone called Optum again the next day, July 8th, asking about out-of-state benefits and was told, again, that her plan covered mental health services only in her state of residence.

---

[1] Stone did not separately move, but included a request for summary judgment in her opposition to Optum's motion.

[2] There apparently are five levels of care for patients with eating disorders. The highest level, for patients who need acute medical care, is inpatient hospital care. Residential treatment is the next level, where a patient obtains treatment in a residential setting that is not a hospital. Next is partial hospitalization, or PHP, where a patient obtains intensive treatment in a hospital or similar setting, and returns home at night. Then the next level is intensive outpatient, or IOP, where a patient receives less intensive care than at the PHP level, and returns home at night. Finally, there is standard outpatient care, where a patient sees a therapist on an occasional basis, such as weekly. *See Kimberley D. v. United Healthcare Ins. Co.*, 2016 U.S. Dist. LEXIS 100406 at *14, n. 3.

United States District Court
Northern District of California

1    On July 11th, Stone called Optum seeking a referral for inpatient care, and later that same

2    day again called, asking if out-of-state intermediate coverage were possible. Stone informed

3    Optum that UCSD recommended a facility in Colorado. Optum again advised that G.S. could only

4    obtain care in California but that Stone could check with her employer to ask if there were any

5    options outside of the Optum coverage.

6    On July 16th, Stone called Optum again and said that she planned to have G.S. obtain

7    treatment at a facility in Colorado. Optum told her again that she had an HMO and benefits would

8    be provided only if care was received in California. Stone responded that this particular program

9    was recommended and used the same modality as UCSD.

10    On July 21st, G.S. began treatment at ERC, the Colorado facility. Two days later, on July

11    23rd, Stone called Optum, asking for the first time that she be given a referral to a residential

12    treatment center for G.S.  She was provided the names of at least eight facilities in California. The

13    following day, ERC contacted Optum directly to ask about coverage. Optum told the ERC that

14    G.S. had no coverage for out-of-state treatment, but that it would be happy to help the parents find

15    appropriate treatment for G.S. in California.

16    Shortly after her arrival at ERC, G.S. was placed on a naso-gastric tube for approximately

17    one week, through which she received supplemental feedings on three occasions. She stepped

18    down to ERC's partial hospitalization program on September 10th and discharged back to

19    UCSD's eating disorder program on September 23rd.

20    Although apparently not reflected in Optum's records, ERC contends it admitted G.S. in

21    reliance on assurances it had received from Optum that treatment for G.S. was covered.  Shortly

22    after G.S. was discharged, ERC wrote Optum demanding payment and insisting that on July 7th it

23    had been provided verification of coverage by an Optum employee named "Raven," and that it had

24    been given a confirmation number, C41581401291193.[3]

25

26    [3]   Stone makes no argument that Optum is estopped or otherwise precluded from denying
coverage based on the representations of Raven.  Even assuming Raven's alleged statements were

27    binding on Optum, that would not obligate Optum to cover the full two months of treatment G.S.
received.  At most, Optum would have to cover the two or three days between G.S.'s admission to

28

3

### III.  LEGAL STANDARDS

In an ERISA action, denial of benefits "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956–57, 103 L. Ed. 2d 80 (1989).  Here, there is no dispute that the benefit plan does not contain a grant of discretion and that review is de novo.

Under such review, the court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).  Generally, the court's review is limited to the evidence contained in the administrative record.  O*peta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007).

"In an ERISA case involving de novo review, the plaintiff has the burden of showing entitlement to benefits." *Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program*, 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010); see also *Richards v. Hewlett-Packard Corp.*, 592 F.3d 232, 239 (1st Cir. 2010) (placing burden on plaintiff to prove disability); *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003) (same).  In conducting its de novo review, the court "considers various circumstances when weighing evidence" and "evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate." *Schramm*, 718 F. Supp. 2d at 1162.

Here, the parties have presented the issues through cross-motions for summary judgment, and the determination must be made through the lens of Rule 56.  Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). The

---

ERC and the time when Optum advised ERC there was no coverage.

United States District Court
Northern District of California

1    moving party "always bears the initial responsibility of informing the district court of the basis for

2    its motion, and identifying those portions of the pleadings and admissions on file, together with

3    the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material

4    fact." *Id*. at 323 (citations and internal quotation marks omitted). If it meets this burden, the

5    moving party is then entitled to judgment as a matter of law when the non-moving party fails to

6    make a sufficient showing on an essential element of the case with respect to which he bears the

7    burden of proof at trial. *Id*. at 322-23. The non-moving party "must set forth specific facts showing

8    that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat

9    the moving party's properly supported motion for summary judgment simply by alleging some

10   factual dispute between the parties.

11          To preclude the entry of summary judgment, the non-moving party must bring forth

12   material facts, *i.e.*, "facts that might affect the outcome of the suit under the governing law . . . .

13   Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty*

14   *Lobby, Inc*., 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show

15   that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v.*

16   *Zenith Radio,* 475 U.S. 574, 588 (1986). The court must draw all reasonable inferences in favor of

17   the non-moving party, including questions of credibility and of the weight to be accorded

18   particular evidence. *Masson v. New Yorker Magazine*, Inc., 501 U.S. 496 (1991) (citing Anderson,

19   477 U.S. at 255); *Matsushita*, 475 U.S. at 588 (1986). It is the court's responsibility "to determine

20   whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background

21   or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor

22   based on that evidence." *T.W. Elec. Service v. Pacific Elec. Contractors*, 809 F.2d 626, 631 (9th

23   Cir. 1987). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that

24   is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

25   *Anderson*, 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a

26   rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

27   *Matsushita*, 475 U.S. at 587.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2                                    IV.  DISCUSSION

3          There is no dispute that Stone's benefit plan on its face excludes coverage for services

4   provided out-of-state.[4]  Stone instead contends Optum has an obligation to pay for G.S.'s

5   treatment in Colorado under the Mental Health Parity and Addiction Equity Act, 29 U.S.C. §

6   1185a and/or under California's Mental Health Parity Act, Cal. Health & Safety Code § 1374.72

7   (collectively "the Parity Acts"). Those laws generally dictate that any benefits for mental health or

8   substance use disorders offered under a healthcare plan be on par with other medical and surgical

9   benefits.

10         The Parity Acts have no application to these facts.  The focus of those laws is to ensure

11  that benefits for mental health and substance abuse problems—including those suffered by G.S.—

12  are no less comprehensive than benefits offered for treatment of physical disorders.  Here, G.S.

13  was not denied coverage because her disorders were mental rather than physical, but because she

14  sought treatment out-of-state rather than in-state. Stone does not argue that Optum would have

15  covered out-of-state treatment of any physical conditions.

16         Although Stone predicates her arguments on the Parity Acts, she also seems to be

17  contending that even in the absence of those laws, Optum would be required to provide coverage

18  for any medically necessary treatment that is not offered in California, but which is available out-

19  of-state. Specifically, Stone insists it was medically necessary for G.S. to be treated at a residential

20  facility that is equipped to utilize naso-gastric feeding tubes, and which did not have a swimming

21  pool posing a risk to G.S. given indications she had some suicidal ideations.[5]

22         This argument fails because Stone has not shown the contract or the law imposes any

23  _____

24  [4]  Stone makes no argument that the exception for emergency services needed by a beneficiary
    while visiting another state applies here.
25

26  [5]  The record strongly supports an inference that G.S.'s parents really wanted a facility that offered
    the Maudsley program. Stone does not argue in these motions that Optum was obligated to
27  provide access to such a program without regard to the geographical limitations of the plan.

28

United States District Court
Northern District of California

1  obligation on Optum to provide benefits of a particular type simply to satisfy the beneficiaries'

2  preferences.  Even assuming a naso-gastric feeding tube was medically necessary for G.S. and that

3  no residential program in California offers that treatment, the result would be that Optum would

4  be obliged to cover G.S.'s treatment at a hospital or whatever higher level of treatment in

5  California includes naso-gastric feeding. Similarly, even assuming swimming pools or other

6  hazards made one or more particular California residential treatment center inappropriate as a

7  matter of medical necessity, Optum's only obligation would be to fund treatment at a level and

8  location that did not pose those risks, not to waive its territorial limitation.[6]

9       Finally, Stone's reliance on *Harlick v. Blue Shield of California*, 686 F.3d 699 (9th Cir.

10  2012) is unavailing. The primary issue in that case was whether the California Parity Act

11  precluded an insurer for declining *any* coverage for residential treatment of an eating disorder.  No

12  in-state versus out-of-state issue was presented. Applying the California Parity Act, the court

13  concluded the exclusion of "residential treatment" for mental health conditions could not stand,

14  where the insurer did provide coverage for comparable treatment of physical ailments.  *See id.* at

15  721 ("We therefore conclude that Blue Shield is obligated under the Parity Act to pay for

16  Harlick's residential care at Castlewood, subject to the same financial terms and conditions it

17  imposes on coverage for physical illnesses.")  As discussed, the present case involves no disparity

18  between coverage for mental conditions and coverage for physical conditions.

19       *Harlick* also held that the insurer could not argue during the litigation that residential

20  treatment was not medically necessary, as it had not premised its denial on that ground during the

21  administrative process.  *Id.* at 720-721.  To the extent Stone is relying on that portion of the

22  opinion, it does not help her here.  Optum has not changed its position as to why coverage is

23  unavailable under the plan for G.S.'s treatment at ERC.  Optum is not contending access to naso-

24

25  [6] Although Stone implies there may be no California residential programs offering naso-gastric

26  feeding, she does not argue they all have swimming pools or equivalent hazards. No reasonable
inference can be drawn from the record that only out-of-state programs are sufficiently safe for

27  persons with eating disorders who also have suicidal ideation.

28

gastric feeding was medically unnecessary for G.S.  Rather, it is merely saying that assuming naso-gastric feeding was a medical necessity, it was unquestionably available in California, even if it might not be offered at California residential treatment facilities.

The only factual disputes Stone suggests exist relate to the medical necessity of naso-gastric feeding and its availability, or lack thereof, in California residential programs. For the reasons explained above, however, Optum was not obligated to expand the geographic scope of its benefits plan even assuming naso-gastric feeding was a medical necessity and is not available at any residential facility in this state.  The material facts are therefore all undisputed, and entitle Optum to judgment in its favor.

### V. CONCLUSION

Optum's motion for summary judgment is granted, and Stone's cross-motion is denied. Good cause appearing, the sealing motion (Dkt. No. 30) is granted.  A separate judgment will be entered.

**IT IS SO ORDERED**.

Dated:  February 6, 2019

_____
RICHARD SEEBORG
United States District Judge